UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
FEILIKS INTERNATIONAL LOGISTICS
HONG KONG LTD., and FEILIKS
LOGISTIC PTE. LTD.,

       Plaintiffs,

- against -

FEILIKS GLOBAL LOGISTISCS CORP.,
and AMI KWAN CHI WEY a.k.a. AMI WEY,

       Defendants.
----------------------------------------------------------------- X
AMI KWAN CHI WEY, individually, and
derivatively on behalf of FEILIKS GLOBAL
LOGISTICS CORP.
     Counterclaim-Plaintiff,

- against -

FEILIKS INTERNATIONAL LOGISTICS
HONG KONG LTD., and FEILIKS LOGISTIC
PTE. LTD., SKYLIFT CONSOLIDATOR (PTE)
LTD., JIANGSU FEILIKS INTERNATIONAL
LOGISTICS INC., TAY KIM LENG a.k.a.
REGINA TAY, and YAO QIN a.k.a. GAVIN
YAO,

     Counterclaim-Defendants.
----------------------------------------------------------------- X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14 Civ. 5366 (BMC)

**COGAN,** District Judge.

   The parties in this lawsuit are a collection of interrelated international freight shipping companies and their directors. They formed a corporation to unite their expertise and capital, but they did not get along, and this lawsuit resulted. The case was tried before me without a jury, and my findings and conclusions are set forth below. To summarize, I find that plaintiffs have failed to prove their claims against defendants, and counterclaim plaintiff Amy Wey, although

proving a breach of fiduciary duty against some of the plaintiffs, has failed to prove damages both legally and factually.

## FINDINGS OF FACT

1. Plaintiff, Feiliks International Logistics Hong Kong Ltd. ("Feiliks HK") is a Hong Kong corporation. Feiliks HK owns 51% of plaintiff Feiliks Logistics Pte Ltd. ("Feiliks Singapore"), an international freight forwarder. The other 49% of Feiliks Singapore is owned by counterclaim defendant Regina Tay. Tay is also the Managing Director of Feiliks Singapore.

2. Feiliks Singapore owns 80% of defendant (and counterclaim plaintiff) Feiliks Global Logistics Corp. ("Feiliks U.S."). As will be more fully explained below, the other 20% of Feiliks U.S. is owned by defendant Ami Wey. Wey, a naturalized U.S. citizen, has been in the business of freight forwarding for roughly 27 years. She is the 100% owner of non-party Formerica Consolidation Service Ltd. ("Formerica"), a company that engaged in the same type of business as Feiliks U.S.

3. Wey and Tay have a long history of working together. Defendant Wey met Tay in 1994, while both were working at Formerica.

4. In addition to owning a portion of Feiliks Singapore, Tay is also employed by, and owns 50% of, non-party Skylift Consolidator (Pte) Ltd. ("Skylift"). Skylift is also in the business of freight forwarding. Formerica and Skylift have common customers which helped facilitate the working relationship between Wey and Tay.

5. Beginning in 1997, Formerica and Skylift began to jointly service and develop customers. The two companies evenly split any profits arising from business between them. In

2012, Formerica earned about 70% of its sales and profit from jointly servicing freight forwarding customers with Skylift.

6. Gavin Yao, a counterclaim defendant, is a chairman or director of plaintiff Feiliks HK. He is also the president of Jiangsu Feiliks International Logistics, Inc. ("Feiliks China").

7. Feiliks U.S. was the product of a Joint Venture Agreement ("JVA") between Wey and Feiliks Singapore. It was created after discussions between Wey, Tay, and Yao. The parties signed a JVA, effective March 31, 2013, to establish Feiliks U.S.

8. Pursuant to the JVA, Feiliks Singapore contributed $160,000 in startup capital and Wey contributed $40,000, along with her expertise. Feiliks Singapore was the 80% shareholder, and Wey owned the remaining 20% of the company. Yao was the President of Feiliks U.S., Tay was the General Manager, and Wey was the Controller/Officer.

9. The JVA stated that "[e]ach [p]arty is expected to devote their due resources to meet the goals of the Joint Venture." The JVA was to last for two years, at which point the parties would evaluate its performance.

10. Pursuant to the terms of the JVA, Wey incorporated Feiliks U.S. as a New York corporation. After its formation, Wey transferred Formerica's business to the new company. At the direction of Tay and Yao, Feiliks China and Skylift also transferred their customers' transportation business to Feiliks U.S.

11. Feiliks U.S., as a company involved in international trade and shipping, was subject to a number of licensing requirements. One of the reasons that Tay and Yao recruited Wey to form Feiliks U.S. was that her United States' citizenship would likely make it easier to secure these various licenses and permits.

12. One of these licenses was called an Indirect Carrier License ("IAC"). An IAC license allows the licensed carrier to tender its customers' air cargo to airlines for export. Formerica had an IAC license, but Feiliks U.S. did not.

13. According to Tay, Wey inappropriately delayed the acquisition of the IAC license. Wey testified, however, that she intended to apply for an IAC license on behalf of Feiliks U.S., but that there were certain logistical details that need to be attended to before she could do so. For example, if Wey applied for an IAC license on behalf of Feiliks U.S., Formerica would have to turn its license over to a qualified individual because Wey could not have two IAC licenses in her name. At the time of the formation of Feiliks U.S., Wey had not yet identified a qualified individual.

14. In the meantime, Formerica arranged air shipments on behalf of Feiliks U.S. It turned over all profits from these shipments to Feiliks U.S., so Feiliks U.S. did not suffer any disadvantage from not having its own licensed individual.

15. Based on these facts, I find that Wey was acting in good faith with regard to her procurement of the IAC license. Although she did not apply for an IAC license, she took action to ensure that Feiliks U.S. was able to effectively operate as if it had an IAC license. Feiliks U.S. was not hindered in any way by the lack of IAC license, and Wey did not personally profit from the relationship between Feiliks U.S. and Formerica.

16. Feiliks U.S. also set out to obtain a Non-Vessel Operating Common Carrier ("NVOCC") Ocean Transportation Intermediary license from the U.S. Federal Maritime Commission ("FMC"). Feiliks needed this license to offer ocean transportation services to its customers. Before acquiring its own license, Feiliks U.S. arranged ocean shipments using RJK Logistics Inc., a company that had worked with Skylift for roughly five years.

17. The FMC will not issue a license unless the applicant provides satisfactory proof of its financial stability. Wey contacted Mark Cunningham, an insurance and bond broker, and asked him to help Feiliks U.S. acquire a NVOCC license. Cunningham is experienced at preparing NVOCC applications. He gave Wey his standard advice which recommended that applicants have at least $300,000 in their bank account to satisfy the FMC.

18. Upon receiving Cunningham's advice, Wey informed Tay about the situation and requested a $300,000 loan to Feiliks U.S. On April 26, 2013, Feiliks HK signed a loan agreement, effectively a promissory note, which extended a $300,000 loan to Feiliks U.S. The loan application specified that it was "to finance the application of FMC Bond for the joint venture company." The agreement stated that the loan would last "12 months from date of remittance suject [sic] to further review."

19. Several days later, Wey submitted a portion of the NVOCC application to the FMC. Wey waited roughly a month to receive a bank statement showing that Feiliks U.S. had over $300,000 in its bank account before submitting Feiliks U.S.'s completed NVOCC application. However, its application was denied.

20. Wey consulted with Cunningham again. She decided to apply for a bond secured by a letter of credit. Wey wrote Tay an email explaining that a $75,000 letter of credit would be required as collateral to have an insurer issue a NVOCC bond. Tay wrote back that Wey should use a portion of the loan for the letter of credit. Eventually, on October 28, 2013, Feiliks U.S. received its NVOCC license.

21. Based on these facts, I find that Wey was also acting in good faith in attempting to obtain the NVOCC license. This finding is supported by the fact that the initial denial of the

NVOCC license came at about the same time as another company had its license application denied despite having $300,000 in its bank account.

22. At the same time that Tay approved using a portion of the loan for the bond, she authorized Wey and Feiliks U.S. to retain the remaining $225,000 to satisfy duties, taxes, and other costs that had to be advanced by Feiliks U.S. during the course of business.

23. The falling out between the parties began after Wey was forced to hire Xiaosui Pu ("Pu"), Yao's brother-in-law. Pu had no experience in the industry. His wife was an intrusive presence at work, and he requested that Feiliks U.S. obtain new office space that Wey thought was unnecessary.

24. Wey quite frequently complained to Tay about Pu. On September 11, 2013, Wey wrote an email to Yao, copying Tay and Julia Guo, a Vice-President of Feiliks China, informing him that she wanted to fire Pu.

25. In response to Wey's concerns, the parties held a meeting in Taipei almost two months later. Tay, Wey, Guo, and Yao all attended. Wey, however, was only allowed to participate in a brief portion of the meeting discussing Pu. After the meeting, Pu was put on unpaid leave, but was not fired.

26. Wey claims she was not satisfied with this decision, but she did not voice her concerns to anyone. Wey testified that her relationship with Tay changed following this meeting; Tay stopped collaborating with her in a close fashion.

27. Following the meeting, Feiliks Singapore's general manager, Mimi Saw, traveled to the U.S. in February 2014. Saw stayed in an apartment leased by Formerica and furnished by Feiliks U.S. During her time in the U.S., Saw solicited business on behalf of Feiliks U.S.

28. However, no one from the Feiliks Singapore side told Wey about Saw's efforts to generate business on behalf of Feiliks U.S. Wey found about these ventures via the companies' joint email account, when the other parties inadvertently passed the emails through the account. Wey was concerned for a couple of reasons.

29. First, she felt that Saw was not complying with U.S. regulations, and that she (Wey), as the NVOOC license holder for Feiliks U.S., could be exposed to liability based on Saw's conduct.

30. Second, Wey correctly perceived that by having Saw work behind her back as the venture's business developer, the parties were trying to cut her out. This was supported by at least one email exchange between Saw and Tay in March 2014, which, again, the Singapore parties failed to realize would be seen by Wey. In that email, Saw explicitly acknowledged that she was acting behind Wey's back: "I know it is dangerous if Ami [Wey] find [sic] out . . . and also adv me if we ([Pu] & I) can continue to do that with confidential emailing to FCN [Felix China]."

31. As a result of these concerns, and some health issues, Wey wanted out of the joint venture as of March 2014. The Singapore parties agreed that Wey should not continue with the business in the future. However, the parties could not agree on how that should be accomplished.

32. Wey wanted to dissolve Feiliks U.S. because her name was on the licenses. Tay and the other members of the joint venture wanted to buy Wey out, rather than allowing her to dissolve the business.

33. In email correspondence from March 2014, Wey and Tay discussed whether Feiliks U.S. should be dissolved and when Wey would cause Feiliks U.S. to repay the loan. Wey

7

confirmed that Feiliks U.S. had the resources to repay the loan, but Wey refused to do so until the dissolution was confirmed. In these emails, Wey made it clear that she would honor her obligations under the joint venture agreement until the dissolution occurred but did not want to be involved with any future business endeavors. Wey testified at trial that she wanted to retain leverage in her negotiations with Tay because she was concerned that if the company was not dissolved, she could be legally and financially liable, as the company's license holder, for Feiliks U.S.'s obligations.

34. Tay did not wait. In April 2014, Wey learned that Feiliks China and Skylift, with the knowledge of Yao and Tay, had been diverting business to competitors of Feiliks U.S. Specifically, Feiliks Singapore and Skylift began telling freight customers that they should use Green Worldwide Shipping instead of Feiliks U.S.

35. Around that same time, Wey also reprimanded Mimi Saw for breaching U.S. rules and regulations that could create legal exposure for Wey. Saw had asked Feiliks U.S. to file a certain export declaration for a shipment that was undertaken jointly with another freight shipping company. Based on the email correspondence from April 1, 2014, Feiliks U.S. was merely facilitating the shipment – it did not know the shipper.

36. Wey testified that Feiliks U.S. could not legally file this declaration because it was not a known shipper and Feiliks U.S. did not have an IAC license – it used Formerica's. Her testimony was corroborated by emails sent by another Feiliks U.S. employee who pushed back against Saw's request. Wey was at a risk of losing her IAC license entirely and facing a fine if she violated U.S. customs regulations.

37. Wey admonished Saw, "[y]our lack of knowledge in US Trade and Regulations directly puts [Feiliks U.S.] as [sic] severe risk when you act outside the scope of your

8

knowledge. IAC is under Formerica, yet another reason I am extremely cautious of your actions, as it is my full responsibility."

38. Shortly after complaining about these actions, Wey received a demand for repayment of $225,000 of the $300,000 loan Feiliks Singapore had made to Feiliks U.S. On August 2, 2014, Wey filed an Order to Show Cause seeking a Temporary Restraining Order ("TRO") against Feiliks Singapore, Tay, and Yao in New York state court. She asked the Court to enjoin them from conducting unauthorized business on behalf of Feiliks U.S., selling or transferring the assets of Feiliks U.S., destroying the business records of Feiliks U.S., or competing with Feiliks U.S., among other requests.

39. Shortly thereafter, in September 2014, plaintiffs filed their complaint against defendants in federal court.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs are all foreign citizens or business entities and defendants, both individuals and corporate, are all citizens of the State of New York

2. Plaintiffs have asserted two claims against defendants. Plaintiffs first assert a breach of contract claim against both Wey and Feiliks U.S. for failing to repay the $300,000 loan Feiliks HK made to Feiliks U.S. Plaintiffs contend that Wey should be held personally and individually liable for the loan because she acted in bad faith. Plaintiffs' second claim is that Wey breached her fiduciary duty to Feiliks U.S. because she did not diligently work to support Feiliks U.S. and she sought, and obtained, a TRO against the majority shareholder in Feiliks U.S.

3. Defendants have asserted counterclaims against the named plaintiffs as well as additional counterclaim defendants Tay, Yao, Feiliks China, and Skylift. Their first claim is that

Feiliks Singapore, as a controlling shareholder, breached its fiduciary duty to Wey and Feiliks U.S. Second, Wey claims Feiliks Singapore, Yao, and Tay breached their fiduciary obligations to her under the JVA and should be found liable for damages. Defendants have not clearly articulated any separate claims against Feiliks China and Skylift, nor have they connected them to the other claims they asserted. They are therefore dismissed as counterclaim defendants.

4. As plaintiffs in this matter, Feiliks Singapore and Feiliks HK bear the burden of proof in their breach of contract and breach of fiduciary duty claims. See Margrabe v. Sexter & Warmflash, P.C., 353 F. App'x 547, 549 (2d Cir. 2009); Abeles, Inc. v. Creekstone Farms Premium Beef, LLC, No. 06 Civ. 3893, 2010 WL 446042 (E.D.N.Y. Feb. 1, 2010).

5. To recover for breach of contract, a plaintiff must prove, by a preponderance of the evidence, the existence of a contract, performance of the contract by one party, breach by the other party, and damages. See Nat'l Makt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004). Feiliks Singapore cannot recover under the breach of contract theory because it did not participate in the loan agreement. See Abraham Zion Corp. v. Lebow, 761 F.2d 93 (2d Cir. 1985).

6. Feiliks U.S. is not liable to Feiliks HK for breach of contract either. A promissory note is a negotiable instrument governed by Article 3 of the Uniform Commercial Code (the "U.C.C."). See Lakhaney v. Anzelone, 788 F. Supp. 160 (S.D.N.Y. 1992). Article 3 requires a note to be payable on demand or at a definite time for it to be considered a negotiable instrument. See U.C.C. § 3-104(1). If a note does not designate a time of payment, or indicate that it is payable on demand, it is presumed to be payable on demand unless there is some indication that a date was intended. Lakhaney, 788 F. Supp. 160.

7. Here, the loan agreement does not have a specific end date – it stated the loan would be repaid "12 months from date of remittance suject [sic] to further review." Based on the testimony and evidence submitted at trial, it seems clear that the parties intended that the loan would not be called for at least one year. Even Wey testified that she understood the loan could be called twelve months after it was made. She did not request a modification of the term of the loan.

8. However, Feiliks U.S.'s failure to repay the loan is excused because plaintiffs frustrated defendants' performance. The frustration of performance defense is based on the rule that "[i]n the case of every contract there is an implied undertaking on the part of each party that he or she will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his or her part." Roswell Capital Partners LLC v. Alt. Const. Tech., 638 F. Supp. 2d 360, 369 (S.D.N.Y. 2009). A fundamental concept behind a contract is that those invoking the contract are under an implied obligation to exercise good faith not to frustrate the contracts that they have entered into. See Lowell v. Twin Disc, Inc., 527 F.2d 767 (2d Cir. 1975).

9. The central purpose of the contract between Feiliks HK and Feiliks U.S. was to help Feiliks U.S. procure licenses that would enable it to secure additional business and promote the success of Feiliks U.S. Feiliks HK began purposefully diverting customers from Feiliks U.S., and Tay was working to sideline Wey. In doing so, Feiliks HK undermined the purpose of the loan agreement. Feiliks Singapore even attempted to call in the loan before its one-year term had passed. Feiliks HK's actions appear to have begun quite suddenly after Wey expressed displeasure about Pu and told her co-partners that she wanted to retire and dissolve the company.

This conduct shows that the plaintiffs were acting in bad faith and attempting to undermine the success of Feiliks U.S. as part of an effort to freeze out Wey.

10. Wey cannot be held personally liable for failure to repay the loan agreement. "A director is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1177 (2d Cir. 1993). Under New York law, it is well-established that an "agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." Mencher v. Weiss, 306 N.Y. 1, 4, 114 N.E.2d 177 (1953). The officer must sign both in a representative and an individual capacity.

11. Plaintiffs failed to prove that Wey assumed personal liability for the contract when she signed the loan agreement. Wey, as the controller of Feiliks U.S., signed the loan agreement on its behalf – there is no indication she intended to sign in an individual capacity as well.

12. Plaintiffs also allege that Wey, as a minority shareholder and partner in Feiliks U.S., breached her fiduciary duty to Feiliks Singapore by monopolizing the operation and control of Feiliks U.S., by securing a TRO against Feiliks Singapore, and other acts of bad faith.

13. The elements of a claim for breach of a fiduciary obligation are: 1) the existence of a fiduciary duty; 2) a knowing breach of that duty; and 3) damages resulting from that breach. See Johnson v. Nextel Commc'ns, 660 F.3d 131 (2d Cir. 2011). "Directors and officers typically owe fiduciary duties to the corporation and its shareholders, which include a 'duty of care' and a 'duty of loyalty.'" Friedman v. Wahrsager, 848 F. Supp. 2d 278, 288 (E.D.N.Y. 2012) (citations omitted). "A fiduciary relationship may exist when one party reposes confidence in another and

12

reasonably relies on the other's superior expertise or knowledge, but not in an arm's-length business transaction involving sophisticated business people." Guarino v. North Country Mortg. Banking Corp., 79 A.D.3d 805, 807, 915 N.Y.S.2d 84 (2d Dep't 2010). Generally, a relationship between a borrower and lender is not a fiduciary relationship. See, e.g., Roswell Capital, 638 F. Supp. 2d 360.

14. As a general matter, a lender is not a fiduciary of its borrower under New York law. See Iannuzzi v. Am. Mortg. Network, Inc., 727 F. Supp. 2d 125 (E.D.N.Y. 2010). Feiliks HK, the lender, did not have a fiduciary relationship with Wey. Because there is no fiduciary relationship between Wey and Feiliks HK, Feiliks HK cannot successfully assert a breach of fiduciary duty claim.

15. Feiliks Singapore's claim for breach of fiduciary duty must also be dismissed because this claim should have been asserted as a derivative action by Feiliks U.S., not a direct suit brought by Feiliks Singapore. It is a general rule that "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, its receiver, if one has been appointed, or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer." Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2d Cir. 1975).

16. In assessing whether a direct or derivative action is appropriate, courts apply the direct injury test. "The critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct." Excimer Assoc., Inc. v. LCA Vision, Inc., 292 F.3d 134, 139-40 (2d Cir. 2002).

17. However, "[u]nder New York law, a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder, whether or not the corporation

may also bring an action." Ceribelli v. Elghanayan, 990 F.2d 62, 63 (2d Cir. 1993). In order to establish the existence of an independent duty, a shareholder must establish a duty owed to the shareholder independent of any duty owing to the corporation. "But, allegations of mismanagement or diversion of assets by officers or directors for their own enrichment, without more, plead a wrong to the corporation, for which a shareholder may sue derivatively but not individually." Abrams v. Donati, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782 (1985).

18. Applying these standards to the present case, I find that the allegations that Amy Wey breached her fiduciary duties by 1) taking control of the corporation, 2) monopolizing control of the company, and 3) initiating a state court action based upon false affidavits that harmed the corporation, should have properly been asserted as derivative actions because the alleged harm fell to the corporation, Feiliks U.S.

19. Additionally, plaintiffs have not established that there was an independent duty between Feiliks Singapore and Wey, nor have the established Feiliks Singapore suffered any sort of independent injury. Wey had a fiduciary duty to Feiliks Singapore because they were shareholders together in Feiliks U.S. However, any breach of this duty should have been asserted as a derivative claim, not a direct action.

20. Before bringing a derivative suit against a corporation, a shareholder must make a demand to the board of the corporation. See N.Y. Bus. Corp. § 626. Rule 23.1 of the Federal Rules of Civil Procedure requires a shareholder wishing to bring a derivative action to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1; see also Ryan v. Aetna Life Ins. Co., 765 F. Supp. 133 (S.D.N.Y. 1991). A demand may be excused if it would be futile but a

complaint must set forth the reasons for not making a demand. See Marx v. Akers, 88 N.Y.2d 189, 644 N.Y.S.2d 121 (1996). Plaintiffs' claim cannot be interpreted by this Court as a derivative action because they failed to make a demand or indicate why they did not do so.

21. More fundamentally, this is not a derivative action because plaintiff is not seeking recovery on behalf of Feiliks U.S. Plaintiffs are seeking to recover for their ow injury, not injury suffered by Feiliks U.S. Because plaintiffs have not complied with the requirements necessary to assert a derivative claim, their claim fails.

22. Defendant Amy Wey has asserted a number of counterclaims individually and derivatively on behalf of Feiliks U.S. against Feiliks HK, Feiliks Singapore, Regina Tay, and Gavin Yao. At the outset, it should be noted that an individual shareholder cannot simultaneously bring direct and derivative claims in the same action. See Tuscano v. Tuscano, 403 F. Supp. 2d 214 (E.D.N.Y. 2005) (collecting cases). If an individual shareholder asserts a direct action on behalf of her own interests, she cannot adequately represent other shareholders in a derivative action. This is because she has a conflict of interest in that she might prefer her own interests over those of the corporation. See Wall St. Sys., Inc. v. Lemence, No. 04 Civ. 5299, 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005). Wey's derivative claim on behalf of Feiliks U.S. cannot proceed because she has asserted her individual interests in a way that makes her an inadequate representative for the other shareholders.

23. Wey has asserted a direct claim against Feiliks Singapore for breach of fiduciary duty. Shareholders in a closely held corporation share a fiduciary duty among themselves. See Benson v. RMJ Sec. Corp., 683 F. Supp. 359 (S.D.N.Y. 1988). Shareholders in a closely held corporation can breach this duty by "utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation." Recurrent Capital Bridge Fund

I, LLC v. ISR Sys. & Sensors Corp., 875 F. Supp. 2d 297, 308 (S.D.N.Y. 2012) (internal citations omitted).

24. An injury of loss of investment value affects all shareholders and the corporation equally and may only be raised in a derivative suit. See Strougo v. Bassini, 282 F.2d 162 (2d Cir. 2002). This is true even in a closely held corporation. See Wolf v. Rand, 248 A.D.2d 401, 685 N.Y.S.2d 708 (1st Dep't 1999). However, "where the plaintiff's injury is direct, the fact that [the corporation] may also have been injured and could assert its own claims does not preclude the plaintiff from asserting its claim directly." Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (quoting Excimer Assocs., Inc v. Vision, Inc., 292 F.3d 134, 140 (2d Cir. 2002)). A direct injury can occur if the "wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged." Id. (quoting Abrams v. Donati, 66 N.Y.2d 951, 498 N.Y.S.2d 782 (1985)).

25. Wey alleges that Feiliks Singapore owed her an independent duty under the JVA and that she suffered a personal injury because she lost her livelihood. Wey invested her expertise and valuable business connections in Feiliks U.S. Her injury – the loss of her livelihood – was unique and may properly be asserted as a direct injury.

26. Feiliks Singapore breached its duty to Wey by appropriating business opportunities that belonged to Feiliks U.S., thus successfully freezing out Wey. This ultimately resulted in a significant reduction in profits for Feiliks U.S. For example, in April 2014, Tay and Saw emailed about developing a potential client called Olivet International. In the email exchange, Tay characterized one of Feiliks U.S.'s competitors, Green Worldwide ("GW"), as Feiliks U.S.'s partner. Tay and Saw were directly diverting business to Green Worldwide that they should have been directing towards Feiliks U.S. Tay also told Saw to inform Olivet that she

was in charging of overseeing Feiliks U.S. sales and business development which undermined Wey's role in the company. Feiliks Singapore informed other potential customers they should work with Green Worldwide, not Feiliks U.S.

27. Around the same time, Feiliks Singapore (which was not a signatory to the loan agreement) also requested repayment of the $300,000 loan on behalf of Feiliks HK. However, the loan had not come to term yet; Feiliks U.S. had several more weeks before it was obligated to repay it. Finally, Mimi Saw, acting on behalf of Feiliks Singapore, acted in a way that exposed Feiliks U.S. and Wey to legal consequences for violating U.S. regulations.

28. Next, Wey claims that counterclaim defendants Feiliks Singapore, Yao, and Tay, breached the JVA contract and should be found liable to her for damages. She argues that defendants diverted the business of Feiliks U.S. to its competitors in violation of the JVA's provision requiring the parties to "devote their due resources to meet the goals" of the JVA.[1]

29. Generally, a parties' rights and obligations under a joint venture arrangement to form a corporation will merge into their obligations as shareholders *inter se* of the corporation. See Sagamore Corp. v. Diamond West Energy Corp., 806 F.2d 373 (2d Cir. 1986). "When the parties intended to merge their entire joint venture agreement, include their rights *inter sese* and the conduct of the business enterprise planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stock holders." Id. at 378. In other words, the joint JVA outlines how the parties will run the corporation but all obligations under the JVA must be enforced as obligations between shareholders.

---

[1] Counterclaim defendants do not challenge that there was a JVA in place between the parties. Because they have not addressed this issue, I accept as true the contention that there was a JVA in effect.

17

30. The JVA outlines the division of responsibilities between the parties, the profit sharing, and other structural elements of forming Feiliks U.S. The agreement explicitly states that Wey will be in charge of setting up Feiliks U.S. Once Feiliks U.S. was established, it was the only vehicle by which the parties conducted their business. Wey's breach of contract claims against Feiliks Singapore, Yao, and Tay, cannot be asserted under the JVA agreement – they are properly asserted as breach of fiduciary claims – as discussed above.

31. One appropriate remedy in cases of breach of fiduciary duty is "the restoration of the trust beneficiaries to the position they would occupied but for the breach of trust." Donovan v. Bierwith, 754 F.2d 1049, 1056 (2d Cir. 1985). Lost profits can be awarded to a plaintiff for breach of fiduciary duties. See Am. Fed. Grp. v. Rothenberg, 136 F.3d 897 (2d Cir. 1998). To recover damages for lost profits one must prove with certainty that the loss was caused by a breach of fiduciary duty, and "must prove with reasonable certainty, though not mathematical precision, the amount of the loss." Id. at 907-08 (citing Ashland Mgmt Inc. v. Janien, 82 N.Y.2d 395, 604 N.Y.S.2d 912 (1993)). Moreover, a plaintiff cannot establish lost profits with the law's requisite certainty where her calculation is dependent upon a host of assumptions concerning uncertain contingencies. See Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V., 28 F. Supp. 2d 126 (S.D.N.Y. 1998).

32. Wey has failed to prove the damages she suffered with any certainty. She suggests that she is entitled to 20 years' worth of damages calculated based upon the average profits of Formerica. That is an absurd claim. Both the length of time and her suggested amount are highly speculative.

33. Nor has Wey provided the Court with any basis for some more reasonable claim. Wey testified at trial that she was only paid a salary by Feiliks U.S. But Wey also testified that

she did not "remember clearly" how much that had been and she did not have any documents reflecting her salary. Wey was accorded a fair opportunity to present this Court with evidence about specific damages she suffered but did not avail herself of that opportunity.

34. Formerica's prior profits do not necessarily equate to Wey's damages. Although Wey transferred Formerica's business to Feiliks U.S., it is not clear how much of those profits Wey would have received. Further, Wey has not even informed the Court about how much she herself earned while running Formerica.

35. For the foregoing reasons, I find that plaintiffs did not prove defendants breached the loan agreement or that Wey was liable for a breach of fiduciary duty. Although I find that Feiliks Singapore breached its fiduciary duty towards Wey, Wey has offered insufficient proof to permit an award of damages.

## CONCLUSION

The complaint and the counterclaims are dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

                                                               U.S.D.J.

Dated: Brooklyn, New York
       March 17, 2016